IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MEE YANG,

        Plaintiff,                  No. CIV S-06-2658 EFB

        vs.

MICHAEL J. ASTRUE,          ORDER
Commissioner of Social Security,[1]

        Defendant.

_____/

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's challenge to a determination that her disability ceased in August 2004, and that she was therefore no longer entitled to Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act ("Act"). For the reasons that follow, plaintiff's motion for summary judgment or remand is granted, the Commissioner's cross-motion for summary judgment is denied, and this case is remanded for immediate payment of benefits. The Clerk is directed to enter judgment for plaintiff.

////

_____

[1] On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of Social Security, replacing Linda McMahon, the original defendant herein. Pursuant to 42 U.S.C. § 405(g) and Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted as the defendant in this action.

1

## I.  BACKGROUND

Plaintiff, born in 1969, is a Hmong immigrant who came to California in or around 1988. Plaintiff was born in Laos, but lived in Thailand as a refugee for about eight years before coming to the United States.  Administrative Record ("AR") 146, 161, 280.  During her family's escape from Laos during the Vietnam War, she was shot by communist soldiers in her left arm, which was later amputated above the elbow.  AR 138.

Plaintiff received SSI benefits beginning in 1990 due to her severe, disabling impairments of depression and post-traumatic stress disorder.  AR 26.  The 1990 allowance decision was based on a finding that plaintiff's impairments met the severity in 12.04 of the Listing of Impairments.  AR 13, 26.

In May 2004, plaintiff was reevaluated in connection with her disability benefits and underwent a twenty-seven minute consultative psychiatric examination performed by Dr. Michael Joyce, M.D.  AR 197-201.  In his report, Dr. Joyce noted that plaintiff's chief complaint was "no arm," and that she indicated, through a translator, that she was not on any psychiatric medication.  AT 197.  Dr. Joyce reported that plaintiff had no major mood complaints, no anxiety, no psychotic symptoms or mania, and did not report any post-traumatic stress symptomatology.  AR 197.  Based on this brief interview, Dr. Joyce found plaintiff to have no mental impairment, assessed her GAF score at  "70 or above," and found her capable of performing work-related activities.[2]  AR 200-01.

////

---

[2]  GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed., Text Revision, 2000) ("DSM IV-TR"). A GAF of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning  (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."  *Id.*

1    In a continuing disability review decision dated August 6, 2004, it was determined that

2  plaintiff's condition had improved and that she had no impairment that met the definition of

3  disability.  AR 277-81.  Plaintiff appealed that decision, alleging that she is unable to work due

4  to her "left arm amputation, pain all over body, low back pain, post-traumatic stress syndrome,

5  depression, can't speak English, can't drive car, and diabetes."  AR 39.

6    On March 1, 2006, following a hearing before administrative law judge ("ALJ") Antonio

7  Acevedo-Torres, the ALJ found that plaintiff was not disabled.[3]  AR 12-18.  The ALJ made the

8  following findings:

9         1.    The claimant did not engage in substantial gainful activity
               after August 1, 2004.
10

---

11    [3] Disability Insurance Benefits are paid to disabled persons who have contributed to the
Social Security program, 42 U.S.C. §§ 401, *et seq*.  Supplemental Security Income is paid to
12  disabled persons with low income.  42 U.S.C. §§ 1382, *et seq*.  Both provisions define disability,
in part, as an "inability to engage in any substantial gainful activity" due to "a medically
13  determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) and
1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under
14  both programs.  *See* 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 and 416.971-76; *Bowen v.
Yuckert*, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:
15
         Step one:  Is the claimant engaging in substantial gainful
16  activity?  If so, the claimant is found not disabled.  If not, proceed
to step two.
17         Step two:  Does the claimant have a "severe" impairment?
If so, proceed to step three.  If not, then a finding of not disabled is
18  appropriate.
         Step three:  Does the claimant's impairment or combination
19  of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
404, Subpt. P, App.1?  If so, the claimant is automatically
20  determined disabled.  If not, proceed to step four.
         Step four:  Is the claimant capable of performing his past
21  work?  If so, the claimant is not disabled.  If not, proceed to step
five.
22         Step five:  Does the claimant have the residual functional
capacity to perform any other work?  If so, the claimant is not
23  disabled.  If not, the claimant is disabled.

24  *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

25    The claimant bears the burden of proof in the first four steps of the sequential evaluation
process.  *Bowen*, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential
26  evaluation process proceeds to step five.  *Id.*

1    2.    The medical evidence establishes that the claimant has an
           amputation of the left arm, but that she does not have an
2          impairment or combination of impairments listed in, or
           medically equal to one listed in Appendix 1, Subpart P, and
3          Regulations no. 4.

4    3.    The claimant's subjective complaints are not consistent
           with the evidence of record and not fully credible.
5
     4.    Since August 2004, there had been medical improvement
6          related to her ability to work.  Since August 2004, the
           claimant has the residual functional capacity to lift 20
7          pounds occasionally, and 10 pounds frequently with her
           right arm (20 CFR 416.945).
8
     5.    The claimant does not have past relevant work.  The
9          claimant is 40 years of age and did not attend school.

10   6.    The framework of Rule 202.16, Appendix 1, Subpart P,
           Regulations No. 4, directs that the claimant is not disabled,
11         as there are a significant number of jobs that she can
           perform.  Example [*sic*] of these jobs are garment sorter,
12         advertising mat distributor, can filler machine operator,
           laundry classifier, and garment bagger.
13
     7.    The claimant was not under a "disability" as defined in the
14         Social Security Act, at any time on and after August 1,
           2004 (20 CFR 416.920(e)).
15

16   AR 17-18.

17          On September 27, 2006, the Appeals Council denied plaintiff's request for review, and

18   the ALJ's decision became the final decision of the Commissioner.  AR 5-7.

19   **II.  ISSUES PRESENTED**

20          In her motion for summary judgment, plaintiff presents several issues challenging the

21   ALJ's decision.  In general, plaintiff asserts that the ALJ erred by finding medical improvement

22   with regard to her ability to do work-related activities.  *See* Pl.'s Mem. of P. & A. in Supp. of

23   Mot. for Summ. J. ("Pl.'s Br."), 32:25-33:8.  More particularly, plaintiff alleges that the ALJ

24   failed to accurately assess the medical evidence with regard to her ability to do work-related

25   activities by: (1) failing to properly assess all of her impairments at step two of the sequential

26   evaluation; (2) failing to credit the opinions of her treating physicians; (3) discrediting her

4

1  testimony and that of her son with respect to the nature and extent of her functional limitations;

2  (4) improperly assessing her residual functional capacity, and, (5) failing to properly question the

3  vocational expert and finding her not disabled based on the grids.[4]

4        Because the ALJ's error in evaluating the opinions of plaintiff's treating physicians is

5  dispositive, the court declines to address the other bases of error alleged by plaintiff.

6  **III.  LEGAL STANDARDS**

7        The Commissioner's decision that a claimant is not disabled will be upheld if the findings

8  of fact are supported by substantial evidence in the record and the proper legal standards were

9  applied.  *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000);

10  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*,

11  180 F.3d 1094, 1097 (9th Cir. 1999).

12        The findings of the Commissioner as to any fact, if supported by substantial evidence,

13  are conclusive.  *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985).  Substantial evidence is

14  more than a mere scintilla, but less than a preponderance.  *Saelee v. Chater*, 94 F.3d 520, 521

15  (9th Cir. 1996).  "'It means such evidence as a reasonable mind might accept as adequate to

16  support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol.*

17  *Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

18        The record as a whole must be considered, *Howard v. Heckler*, 782 F.2d 1484, 1487 (9th

19  Cir. 1986), and both the evidence that supports and the evidence that detracts from the ALJ's

20  conclusion weighed.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  The court may

21  not affirm the ALJ's decision simply by isolating a specific quantum of supporting evidence.

22  *Id.*; *see also Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989).

23

24      [4] The "grids" are the Medical Vocational Guidelines, which appear in table form and reflect combinations of residual functional capacity, age, education, and work experience.  They are an administrative tool used by the Secretary for determining disability when considering

25  claimants with substantially uniform levels of impairment.  *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988); *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 577-78

26  (9th Cir. 1988) (Pregerson, J., concurring).

1  "The ALJ is responsible for determining credibility, resolving conflicts in medical

2  testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.

3  2001) (citations omitted).  If substantial evidence supports the administrative findings, or if there

4  is conflicting evidence supporting a finding of either disability or nondisability, the finding of

5  the ALJ is conclusive, *see Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th Cir. 1987), and may

6  be set aside only if an improper legal standard was applied in weighing the evidence.  *See*

7  *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

8  With regard to the issue of medical improvement, "once a claimant has been found

9  disabled, he or she is entitled to a presumption that the disability still exists.  The Secretary then

10  has the burden to come forward with evidence of improvement.  This evidence must be reviewed

11  under the 'substantial evidence' standard." *Murray v. Heckler*, 722 F.2d 499, 500 (9th Cir. 1983)

12  (citing *Patti v. Schweiker*, 669 F.2d 582, 587 (9th Cir. 1982)(internal citations omitted)).

13  **IV.  ANALYSIS**

14  In assessing the ALJ's determination of medical improvement, the court addresses the

15  ALJ's rejection of all three treating physician opinions, with particular attention to the ALJ's

16  implicit determination that plaintiff had no severe mental impairment.[5]  Incidentally, the court

17  notes that the ALJ did not identify any of the treating physicians by name or as treating

18  physicians.  AR 14.

19  The weight given to medical opinions depends in part on whether they are proffered by

20  treating, examining, or non-examining professionals. *Lester*, 81 F.3d at 830.  Ordinarily, more

21  weight is given to the opinion of a treating professional, who has a greater opportunity to know

22  and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir.

23  1996).

24

25  [5] Curiously, although the ALJ never made an explicit finding with regard to the
existence or severity of plaintiff's mental impairment, he nonetheless discussed the "B" and "C"
26  criteria for evaluating mental impairments.  AR 15-16; *see* 20 C.F.R. § 416.920a(b)-(d).

1    To evaluate whether an ALJ properly rejected a medical opinion, in addition to

2  considering its source, the court considers whether (1) contradictory opinions are in the record;

3  and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a

4  treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81

5  F.3d at 831.  In contrast, a contradicted opinion of a treating or examining professional may be

6  rejected for "specific and legitimate" reasons, that are supported by substantial evidence.  *Id.*, at

7  830.  While a treating professional's opinion generally is accorded superior weight, if it is

8  contradicted by a supported examining professional's opinion (e.g., supported by different

9  independent clinical findings), the ALJ may resolve the conflict.  *Andrews v. Shalala*, 53 F.3d

10  1035, 1041 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

11  However, "[w]hen an examining physician relies on the same clinical findings as a treating

12  physician, but differs only in his or her conclusions, the conclusions of the examining physician

13  are not 'substantial evidence.'"  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).

14    The ALJ's finding of medical improvement with regard to plaintiff's affective disorder

15  was based primarily on the twenty-seven minute evaluation conducted by Dr. Joyce in May

16  2004.  AR 13, 16, 197-201.  Plaintiff was accompanied to the evaluation by her cousin, who

17  served as an interpreter.  AR 197.  Dr. Joyce's assessment that plaintiff was capable of

18  performing work-related activities, was based in part, on his observation that plaintiff was

19  "euthymic" and responded to humor during the interview.[6]  AR 199.  He wrote there was

20  "nothing to suggest suicidality," and that plaintiff did "not report any post-traumatic stress

21  symptomatology related to her flight from Laos."  AR 197.  He further reported "no major mood

22  complaints" and noted that plaintiff was not on psychiatric medication at the time."  *Id.*

23    His "objective findings" consisted of a brief series of tasks that tested plaintiff's basic

24  memory and cognition.  AR 197-201.  In response to those tasks, plaintiff reportedly answered "I

25

26    [6] "Euthymic" means characterized by moderation of mood, not manic or depressed. *See Stedman's Medical Dictionary*, 627 (27th ed. 2000).

7

1    don't know" or "I don't remember" to many questions, could only remember one out of three

2    new words after two minutes, was unable to identify coins or make change, thought there were

3    ten months in a year, and did not know which direction she would be going if she drove from

4    Sacramento to San Francisco.  AR 199-200.

5        Based on this evaluation, Dr. Joyce opined that plaintiff could follow simple and complex

6    instructions, maintain attendance at work, ask simple questions, request assistance when needed,

7    respond appropriately to supervision, coworkers, or the usual work situation including changes

8    in a routine setting."  AR 200-01.  He found that plaintiff had no "Axis I condition."[7]  AR 200.

9        This opinion is contradicted by plaintiff's treating physician, Dr. Edward Perry Benhow,

10   M.D., who treated her from September 2004 through January 2006, at the Sutter-Yuba Mental

11   Health Center in connection with her complaints of depression, sleeplessness, suicidal ideation,

12   and post-traumatic stress.  AR 289-93; 329-31.

13       In September 2004, plaintiff reported depression, frequent crying, problems sleeping,

14   difficulty concentrating, suicidal ideation, nightmares, flashbacks, and fearfulness.  AR 295-300.

15   She also reported being re-traumatized the year before when someone near her at a Hmong social

16   gathering was shot.  AR 296.  She was given a provisional diagnosis of chronic post-traumatic

17   stress disorder ("PTSD") and dysthymic disorder, and assessed a GAF score of between 46 and

18   51.[8]  AR 301-02.

19       Plaintiff continued to be seen at the clinic by Dr. Benhow, who prescribed her anti-

20   depressants, and assessed her GAF score at 50.  AR 294.  His treatment notes indicate that

21   plaintiff continued to report suicidal ideation and nightmares, depression, and showed little signs

22   of improvement.  *See* AR 289-294, 329-30.

23

24       [7] "Axis I" disorders include mood disorders, anxiety disorders, sleep disorders, and
adjustment disorders.  *See* DSM IV-TR, at 27-28.

25       [8] A GAF score of 41-50 indicates serious symptoms such as suicidal ideation, severe
obsessional rituals, or serious impairment in social, work, or school functioning.  *See* DSM IV-
26   TR, at 34.

1    On January 24, 2006, Dr. Benhow completed a questionnaire regarding plaintiff's

2  residual functional capacity in connection with her mental impairments.  AR 333-36.  He

3  identified plaintiff's diagnoses as "major depression, mod., not psychotic 296.33," and "post

4  traumatic stress disorder 309.81."  AR 333.  As to her prognosis, he noted that she had only a

5  moderate response to medication, which suggested an "ongoing emotional disability

6  compounded by [left arm] amputation."  AR 334.

7    Based on plaintiff's impairments, Dr. Benhow found that she had "moderately severe"

8  restrictions in her ability to relate to others and to perform daily activities.  AR 336.  He also

9  found her to have moderately severe restrictions in her ability to follow instructions and perform

10  complex and simple tasks in a full-time work setting.  AR 336.  He found that she was

11  moderately impaired in her ability to perform work requiring minimal or frequent contact with

12  others.  *Id.*  He opined that as a "war traumatized immigrant" with an upper extremity

13  amputation and no language skills, she would "need exceptional rehabilitation and

14  accommodation to work – she has responsibility for 5-6 dependent children"  *Id.*

15    The ALJ rejected this opinion because it was "based, in part, on the claimant [*sic*]

16  musculoskeletal complaints, cultural differences, and her responsibility to care for her 5-6

17  dependent children."  AR 14.  He also found the records from the Sutter-Yuba Mental Health

18  Center to be "generally benign," and noted that they did "not reflect any objective findings or the

19  result of psychological testing."  *Id.*

20    The ALJ further discounted Dr. Benhow's opinion, commenting that despite plaintiff's

21  allegations of serious mental limitations, the record did not show that she had been referred for

22  more aggressive therapy or hospitalized for her symptoms.  AR 16.  He also found that plaintiff

23  had been able to function independently despite her complaints.  *Id.*

24    The ALJ's reasons for rejecting Dr. Benhow's opinion mischaracterize the record and, as

25  such, lack legitimacy.  First, the court notes that the ALJ failed to acknowledge Dr. Benhow's

26  status as a treating physician, and made no comment regarding the existence or duration of the

9

1 | treating relationship between him and plaintiff.

2 | Further, contrary to the ALJ's assertions, Dr. Benhow's opinion was not based on

3 | plaintiff's musculoskeletal complaints or cultural differences, but rather on her diagnosed mental

4 | impairments.  Dr. Benhow merely noted that these impairments were "compounded by" her left

5 | arm amputation, and made the very rational observation that plaintiff's amputation and inability

6 | to speak English, in addition to her traumatization, would exacerbate her already impaired ability

7 | to work.

8 | Moreover, the records from the Sutter-Yuba Mental Health Center support Dr. Benhow's

9 | finding that plaintiff's response to medication was only moderate, and that plaintiff's condition

10 | was ongoing and chronic.  AR 289-94.  Those records show that plaintiff continued to report

11 | suicidal ideation, sleeplessness, and depression despite increases in her medication.  *Id.*

12 | Additionally, the ALJ's comment that these records did "not reflect any objective

13 | findings or the result of psychological testing" is not well-taken.  AR 14.  "Psychiatric

14 | impairments are not as readily amenable to substantiation by objective laboratory testing as are

15 | medical impairments and consequently, the diagnostic techniques employed in the field of

16 | psychiatry may be less tangible than those in the field of medicine."  *Hartman v. Bowen*, 636 F.

17 | Supp. 129, 131-132 (N.D. Cal. 1986) (citing *Lebus v. Harris*, 526 F. Supp. 56, 60 (N.D. Cal.

18 | 1981)).  "Thus, when mental illness is the basis of a disability claim, as in this case, clinical and

19 | laboratory data may consist of the diagnoses and observations of professional psychiatrists and

20 | psychologists."  *Id.*  (internal citations omitted).

21 | Here, Dr. Benhow's diagnoses and opinion were based on his treatment and observations

22 | of plaintiff for more than a year.  Contrasted with Dr. Joyce's twenty-seven minute interview of

23 | plaintiff, which consisted of little more than a few cognitive tests (on which plaintiff's

24 | performance was arguably poor), Dr. Benhow's opinion is entitled to greater weight.  *See Orn*,

25 | 495 F.3d at 632-33 ("[E]ven when contradicted by an opinion of an examining physician that

26 | constitutes substantial evidence, the treating physician's opinion is still entitled to deference.  In

10

1   many cases, a treating source's medical opinion will be entitled to the greatest weight and should

2   be adopted, even if it does not meet the test for controlling weight.") (internal citations and

3   quotations omitted).

4          Finally, although the record contains no recommendation of hospitalization or aggressive

5   therapy, it does show, contrary to the ALJ's assertion, that plaintiff was not able to function

6   independently and led a rather confined existence in her home.  For example, plaintiff indicated

7   that she needed help with bathing, grooming, cooking, doing the dishes, shopping, and did not

8   venture far from her home because she was scared and did not speak English.  AR 63-93, 363-

9   71.  She also relied on her husband to help regulate her medication.  AR 367.  The ALJ

10  discounted all this evidence, to the extent he discussed it, relying instead on Dr. Joyce's

11  conclusory statement that plaintiff "is independent in her activities of daily living."  AR 16, 198.

12  Significantly, no other evidence in the record supports this unelucidated statement in the

13  consultative examiner's report.

14         While the court acknowledges that the ALJ was troubled by plaintiff's lack of psychiatric

15  treatment from 1990 through 2004, it should be noted that he failed to probe this issue.  As

16  discussed above, he discounted evidence that plaintiff led a very sheltered life with extensive

17  family support, and he did not consider any relevant cultural factors.  In any event, the ALJ's

18  concern over plaintiff's lack of mental health treatment did not entitle him to completely reject

19  the diagnosis and opinion of Dr. Benhow.  As set forth above, his reasons for rejecting Dr.

20  Benhow's opinion did not accurately reflect the opinion itself or the evidence underlying it.

21  Moreover, the ALJ did not even discuss Dr. Benhow's diagnoses, let alone provide reasons for

22  dismissing them.  As such, his reasons for rejecting Dr. Benhow's opinion lacked legitimacy and

23  were not supported by substantial evidence.  *See Orn*, 495 F.3d at 633 ("Even if the treating

24  doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without

25  providing specific and legitimate reasons supported by substantial evidence in the record.")

26  (citations and quotations omitted).

1    The ALJ's treatment of the other treating physicians' opinions was similarly flawed.

2   Plaintiff's treating physician, Dr. Wu-Hsiung Su, M.D., treated plaintiff at the We-Care Medical

3   Center beginning 2001, and completed an evaluation form concerning her musculoskeletal

4   impairments on December 3, 2004.  AR 260.  Dr. Su identified plaintiff's diagnoses as "left arm

5   s/p [status post] amputation, arthritis, and diabetes."  *Id.*  He further indicated that plaintiff had

6   motor weakness, diminished reflexes and "numbness paresthesia."[9]  *Id*.  He opined that plaintiff

7   could lift or carry less than ten pounds occasionally due to pain and weakness and amputation of

8   her left arm.  AR 261.  He also found that plaintiff could only stand, walk, and sit for two hours

9   in an eight-hour workday, had to alternate between sitting and standing, and had to change

10   positions, due to pain and weakness.  AR 261-62.  He indicated that plaintiff had severe

11   limitations in climbing, balancing, stooping, kneeling, crouching, and crawling due to pain.  AR

12   262.

13    The ALJ rejected Dr. Su's opinion as unsupported because his treatment notes did not

14   contain any objective evidence to support the opined limitations, and because the record was

15   "devoid of any objective clinical findings which show that plaintiff's ability to sit, stand, and

16   walk are limited."  AR 14.  He also rejected the opinion as "speculative."  *Id.*

17    The ALJ's conclusion that the record was devoid of any objective clinical findings with

18   regard to limitations in sitting, standing and walking ignores Dr. Su's diagnoses of arthritis and

19   diabetes.  Indeed, the ALJ makes no mention of plaintiff's arthritis, not even to identify Dr. Su's

20   diagnosis.  Although the treatment notes are sparse, there are numerous indications that plaintiff

21   was treated over the course of several years for arthritis, which caused pain primarily in her

22   lower back, and which was treated with pain medication and Celebrex.[10]  *See* AR 177, 305, 323,

23

24    [9]  "Paresthesia" is an abnormal sensation, such as of burning, pricking, tickling in an
     extremity.  *Stedman's Medical Dictionary*, 1316 (27th ed. 2000).

25

26    [10]  Celebrex is indicated for relief of symptoms associated with osteoarthritis.  *See*
     *Physicians' Desk Reference* 3066 (62nd ed. 2008).

1   326, 349.

2        Furthermore, the record shows that plaintiff received consistent treatment for her type II

3   diabetes mellitus, and that this condition resulted in neuropathy, causing diminished sensation

4   and tenderness in her extremities.  *See* AR 308, 318, 321, 327.  The record also contains

5   evidence that plaintiff's diabetes was often poorly controlled despite frequent treatment.  *See,*

6   *e.g.,* AR 307, 310, 314, 318, 320, 321, 323, 325 (evidencing high glucose levels).[11]

7        Even examining physician, Dr. Rajeswari Kumar, M.D., on whose opinion the ALJ

8   relied, noted reduced distal sensation to touch and position in both plaintiff's lower extremities

9   as well as in the palm of her right hand.  AR 205.  Dr. Kumar also found some restriction in

10  plaintiff's lumbar spine and left upper extremity, as well as evidence of peripheral neuropathy in

11  her lower extremities.  AR 205-06.

12       Another treating physician, Dr. Augusto Sychukuk, M.D., also opined that plaintiff's

13  ability to sit, stand, and walk were seriously limited due to her poorly controlled diabetes and

14  attendant pain, including headaches and muscle pain.  AR 351-52.  The record shows plaintiff's

15  frequent treatment for headaches, and, as noted above, pain in her lower back and extremities.

16  *See, e.g.*, AR 205, 306, 310, 314-15, 318, 320-23, 326-27.  Like Dr. Su, Dr. Sychukuk opined

17  that plaintiff could only walk, stand or sit for one to two hours without interruption during an

18  eight-hour workday.  AR 350.  The ALJ rejected Dr. Sychukuk's opinion as speculative and

19  unsupported by "any objective evidence which shows that the claimant's ability to sit, stand, and

20  walk are limited."  AR 14.

21       As discussed above, the ALJ completely ignored evidence of plaintiff's arthritis, and

22  failed to even acknowledge her diagnosis as to this impairment.  He was likewise dismissive of

23  plaintiff's diabetes, incorrectly concluding that "examinations [with regard to her diabetes] do

24

25   [11]  A normal fasting blood glucose level is less than 100mg/dl, and a normal blood
     glucose range is less than 140 mg/dl.  *See* Merck & Co., *The Merck Manual of Diagnosis and*
     *Therapy* 1275, Table 158-2 (18th ed. 2006).  The record shows plaintiff often had glucose levels
26   in the 200s and 300s.  *See* AR 307, 310, 314, 318, 320, 321, 323, 325.

1 not reflect any related findings." AR 14.  Accordingly, his rejection of the opinions of Drs.

2 Sychukuk and Su as unsupported by "any" objective clinical findings amounts to a serious

3 mischaracterization of the record.  As such, this was not a legitimate reason for rejecting their

4 opinions and constitutes error.

5 　　　　Where the ALJ "fails to provide adequate reasons for rejecting the opinion of a treating

6 or examining physician, [the court] credit[s] that opinion as a matter of law." *Lester*, 81 F.3d at

7 834.  The remaining question is whether to remand this case to the ALJ, or to remand for the

8 payment of benefits.  "The decision whether to remand the case for additional evidence or

9 simply to award benefits is within the discretion of the court." *Stone v. Heckler*, 761 F.2d 530,

10 533 (9th Cir. 1985).  Generally, the court will direct the award of benefits "in cases where no

11 useful purpose would be served by further administrative proceedings or where the record has

12 been thoroughly developed." *Varney v. Secretary of Health and Human Services*, 859 F.2d

13 1396, 1399 (9th Cir. 1987).

14 　　　Here, crediting all three treating physicians' opinions as a matter of law establishes that

15 plaintiff does not have the residual functional capacity to perform the requirements of work, and

16 as such, "there are no outstanding issues that must be resolved before a determination of

17 disability can be made." *See Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).  Thus,

18 further development of the record would serve no meaningful purpose and this matter will be

19 remanded for payment of benefits.  Accordingly, the court will not address plaintiff's other

20 assertions of error, even though some of them, such as the ALJ's failure to properly discuss or

21 give cogent reasons for discounting the testimony of plaintiff's son, are well-taken. *See Dodrill*

22 *v. Shalala*, 12 F.3d 915, 919 (ALJ must give cogent reasons germane to each witness in order to

23 discount lay testimony); *Stout v. Comm'r*, 454 F.3d 1050, 1056 (9th Cir. 2006) (Where ALJ fails

24 "to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot

25 consider the error harmless unless it can confidently conclude that no reasonable ALJ, when

26 fully crediting the testimony, could have reached a different disability determination.").

14

1    For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C.

2  § 405(g) for immediate payment of benefits.

3         Accordingly, IT IS HEREBY ORDERED that:

4         1.  Plaintiff's motion for summary judgment is granted;

5         2.  The Commissioner's cross-motion for summary judgment is denied; and,

6         3.  This action is remanded to the Commissioner for immediate payment of

7  benefits.

8  DATED:  March 25, 2008.

9

10       EDMUND F. BRENNAN
         UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

15